Thank you, Your Honor. May it please the Court, my name is Kristen Boyles and I represent the human health and farm worker organizations that have petitioned this Court for action. I have three points this morning to explain why EPA's five-year delay in responding to our petition to cancel and revoke all uses of the highly toxic chemical chlorpyrifos is unreasonable. There is no dispute here that the six factors laid out in the Telecom Research and Action Center case, which are known as the TRAC factors, apply here. My first point- Counsel? Yes, sir. Counsel, I'm sorry to interrupt, but I have one preliminary question. You originally filed in the Southern District of New York and now you're on mandamus before the Ninth Circuit. What is the status of SBNY and do we pay any attention to that and vice versa? Your Honor, the status of the case in the Southern District of New York is that it is stayed pending the resolution of this petition here. The Southern District of New York Court knows about this action. We have stayed that case because, really out of abundance of caution, it became clear during the proceedings and the discussions that we had with EPA when we were in the Southern District of New York that jurisdiction lied, lay in the appellate court and not at the district court level. That is our- And you brought it, but you brought it to the Ninth Circuit, not to the Second Circuit. That is correct, Your Honor. So why didn't you dismiss the case back in New York? Well, I'm not sure the case law is 100 percent clear, Your Honor, and I've been doing some- You question whether or not we even have jurisdiction? I believe you have jurisdiction and EPA agrees with that. But until this Court ruled, I did not want to dismiss our action in New York. Well, one could, one might, you know, that you're, you know, you're, you know, you're form-shopping. Absolutely not, Your Honor. We have- Well, if they have, if the Southern District has jurisdiction, why are you here? Any appellate court has jurisdiction, Your Honor. And we were in the Southern District- Okay, I mean, if the Southern District has jurisdiction, why aren't you just litigating all this in front of the Southern District? Because, Your Honor, we believe, and EPA agrees with us, that jurisdiction lies in the appellate court. We're just going circle, round in circles. But, I mean, why don't I litigate it in the Second Circuit, Your Honor? No, I mean, no, well, you haven't dismissed the case in the Southern District. That is correct. Correct? Correct. Because you're not sure that we have jurisdiction. I am myself 99 percent sure that you have jurisdiction, but I think it would be a disservice to dismiss that case when it's currently on a suspended docket, the district court understands what's going on, we then don't have to fight about jurisdiction between ourselves and EPA, and we can move on to the matter of the unreasonable delay, which during that, this fight would be, would become even more unreasonable. And as Judge Fischer didn't say this, but as he might have suggested, that, that, you know, if the Southern District had jurisdiction, your appeal would be to the Second Circuit, not to the Ninth Circuit. My appeal from the Southern District? Absolutely. Absolutely. Your Honor, we chose to file on this- Your position is that although your appeal of the district court in New York would be to the Second Circuit, you can come to a different circuit with a mandamus petition. That's precisely right, Your Honor. I understand that. So it does look to me like practically, though, it's got sort of an appearance of Hannah trying to hold EPA's feet to the fire with one foot in a fire in New York. Another foot with a fire in Seattle. Well, Your Honor, I do think Hannah would like to hold EPA's feet to the fire. I don't want to, I don't want to not say that. That's an unfair characterization. But I do think what happened is, is that I think, I think we made an error filing in New York. We never got anywhere with that case. We immediately entered into conversations with EPA about setting a date certain for an answer. And we came to a date where EPA made a commitment to give us an answer on the petition by November of 2011. And the case right then went onto the suspended case docket. Nothing actually happened in the Southern District of New York. When EPA missed that commitment, and then when EPA missed another commitment that they had given us for a February 2012 date, we decided we needed to seek the writ of mandamus action. And we chose to come here because, frankly, Your Honor, this is where Hannah and NRDC are located in the Ninth Circuit. And so when we look at the factors now that are in front of the court to say whether or not this is an unreasonable delay, we look at the track factors. And those are the factors that talk about whether there's a rule of reason, the rule of reason whether or not a five-year delay when you're talking about a human health issue and where Congress has talked about in the statutes that we're dealing with here, the need for a protective broad scheme to protect people and the farm workers and the children at issue. And then when we're talking about the reason why we petitioned for the ban of chlorpyrifos in the first place. So what relief are you seeking? We're seeking an order from this court ordering EPA to act by a date certain. How much time would we give them? Six months? Two months? A year? I actually think, Your Honor, that the most important thing is you give them a date because I'm afraid that this will languish and slip even further. By their own admission Well, they just filed a status report giving a tentative date. They gave a very tentative date of February 2014. But they do not commit to that date. And in fact, in that letter that we received a week ago, you will note that they say that they will not commit to that date because they have some doubt about whether they'll be able to meet that date. Let me ask you, is it your position that they've done nothing? It's my position that they did nothing until we brought the case in the Southern District of New York. Well, let's start with that. I mean, once you, once they, it looks to me like they have taken some action. They just haven't ruled on the heart of your petition. They have taken some action, Your Honor, but taking action and the process of taking action is very different than actually acting and giving us a decision. We believe that the evidence in the petition in 2007 was sufficient to support the ban of chlorpyrifos. We believe the evidence, excuse me, that the agency has acquired since then supports that, does nothing to undermine that. And we believe that there are children and farm workers being poisoned every year by this pesticide. Let me say, can they just ban it without doing any notice and publication? They have two options. Under the Food and Drug Act, they have three options. They can immediately issue a ruling that bans some or all. They can put out a proposed rule that would then have the notice and comment opportunities or they can deny our petition. But until they do one of those three things, we are entirely in limbo. We cannot help them go forward with a protection of farm workers and children. If they put any kind of restrictions or limitations on the use of this pesticide, does the industry have a right to seek judicial review? They will. Yes, Your Honor. And I think, I am not going to sit here and say that these are complex issues, but they have not dealt with the core of our petition. The issues that they have left remaining are issues that go to the heart of why we are bringing this action to ban this pesticide, including their failure to consider evidence of the long-lasting effects of childhood exposure, their disregard of evidence showing no safe levels for children or infants or in utero exposure, the failure to incorporate studies saying that the way for children and that kind of early exposure and their failure to consider inhalation exposures. Those are the core issues of our petition. Counsel, sorry to interrupt with this sound delay, but I just need to break in to get a question answered, which is, I am still not understanding your response to Judge Paez, which is, what do you want us to do? There is a February 2014 date that has been set by the EPA, tentative as it may be. What would you expect this court on a mandamus action to order EPA to do that is different? Would you expect us to say they must, at all costs, have a final decision, a final ruling on your petition, any of the three options that you mentioned by February 2014? Yes, Your Honor. I would like, we would ask this court to find that EPA has unreasonably delayed their action on this petition and to set a date certain for them to act. And if the date certain is the date that they have given of February 2014, that would suffice in order to get us to a place where there is a decision that we are going to be able to rely on and know whether or not the EPA is going to go forward with the ban of clopyrifos or if they are going to deny us and then we will be able to challenge that denial. The need for a date certain is really, I think, central here because what we have is an agency that has not acted and has only acted when there seems to be some sort of looming court until two weeks before EPA's petition response was due in this court and then all of a sudden we got quite a bit of paper from EPA. The agency has been allowing this to drag on and if it goes to 2014, we are talking about seven full growing seasons of the use of clopyrifos in the face of this mounting evidence that this is a highly toxic substance that should not be allowed to be out there poisoning farm workers and children. EPA banned this substance for residential uses in 2000. It has not been used in residential areas since 2000 and yet we are still continuing to allow it to be used and so I think this court can step in and say enough is enough, science will always evolve, we need to have a decision so we can move forward with those kind of protections. Your Honor, I will save the rest of my time for rebuttal. That's fine. We will hear from the EPA and... Good morning, Your Honors. I'm David Carson here on behalf of EPA. With me at counsel table is Mark Diner from EPA's Office of General Counsel. First off, I would just say that we do agree that this court has jurisdiction over the petition. We have not raised that as an issue at all. But mandamus is an extreme remedy and it's set aside only for extreme cases. This isn't such an extreme case. EPA has already provided a response to petitioners on most of the issues that they've raised, more than half of the issues that they've raised. On the spray drift issue, there's two components to it. There's a primary spray drift issue and EPA has already completely dealt with that. It granted the petition on that. What does that mean? That has now been fully implemented. In operation? It means that there are additional buffers that have been set aside and reduced application rates. So that's the mitigation that's been provided. There's a second element to spray drift, which is what we call secondary spray drift or volatilization. This month, EPA will be publishing a notice in the Federal Register seeking comment on its assessment of that issue. It's really a groundbreaking assessment because it's the first time that EPA has done that kind of an assessment for the post-application volatilization of a semi-volatile pesticide as opposed to pesticides that are gaseous in nature. So EPA intends to put it out there for public comment, get the comment, and then take action after it has an opportunity to evaluate all that comment, either by the end of the year when it completes the rest of its human health risk assessment, but either by February when it completes that, or if it deems action is necessary sooner than that, it will take action sooner than that. So that will address the drift issue, the inhalation issue. The remaining issues are on the cutting edge of science and are extremely complex. They revolve around incorporating epidemiological studies into a human health risk assessment, which traditionally EPA has not done for conventional pesticides in the quantitative sense that petitioners want EPA to do. There are several studies out there, two of which are not quite as relevant as the third to analyze metabolites other than chlorpyrifos. There is one from the Columbia University that did focus on chlorpyrifos, but there are a number of issues with that study, and EPA has noted those issues. The Scientific Advisory Panel of Independent Experts has agreed with EPA that there are some issues that have to be worked through before EPA can really incorporate those into a human health risk assessment in a quantitative sense. The thing is that typically what EPA has done for human health risk assessment is they have used controlled dosing of laboratory animals where we know the dose, we know the response, and you have all of that information. In this particular study what happened is, and this was during prior to the residential use ban, that's when the impacts occurred. There were one-time measurements taken of pregnant women at birth of their umbilical cords and of the women themselves, and there were a number of things. They weren't, I mean, they were looking at all kinds of things that might affect the motor development of children, not just chlorpyrifos. It wasn't designed for that, but chlorpyrifos was present in the blood, as were other organophosphate pesticides, as were other toxins such as lead. The panel, the Scientific Advisory Panel, has recognized that you can't just single out chlorpyrifos and say it's causing these impacts. In addition- Let me, if I may ask you a question that's sort of a, in my mind, a big picture issue. Probably it should be clear to me, but isn't right now. If the EPA were to ban this particular pesticide or further restrict it, then what would happen with the farmers or the people who use it? Would they, is there another product that's been approved that they could shift to? Or would they just not use pesticides to that great an extent with the impacts on crops or would- I think it depends upon the crop, your honor, and I don't have a sufficient understanding of exactly which crops would have an alternative, which wouldn't. In the, in the, um, 2001 interim regibility, uh, registration eligibility determination, which I think is the first attachment to the housing or declaration we filed, there is some information on that. In my recollection and reading through it is that there are some crops for which there is no alternative. And so, you know, one thing that we would like to point out here, and I think it was, it was hit upon in the previous argument, that whatever EPA does here, we do anticipate that there's going to be some pushback. I mean, petitioners have certainly indicated that they would like to have their day in court if EPA denies their petition. And, um, this is an extremely widely used pesticide, so I think it's reasonable to presume that we might have a challenge from the registrants if EPA grants their petition. And so, you know, part of the issue is here that EPA needs to do further additional analysis and really make its record before it makes any decisions. If you were to ban this particular pesticide, what is the standard you would have to meet? We would have to show under the FDCA that it's not safe, basically. How is safe defined? It is defined as a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposures and all other exposures for which there is reliable information. And there are a number of factors, statutory factors as well, that EPA considers, but that's the primary criterion. Well, it seems to me, obviously it would be preferable if EPA could finish every bit of study it wants to do, but also that it can't go on forever. And EPA? If EPA were to say, we just can't respond on this for 100 years, then you would agree that's unreasonable and we should order something. No, we certainly recognize that. And I think we have to keep in mind that EPA has done quite a bit of analysis already with respect to the epidemiological studies that are kind of driving petitioner's concern. I mean, I really think it's unfair for petitioners to come in and say, well, EPA hadn't done anything on this. In fact, I mean, there have been two scientific advisory panel meetings that have specifically focused on this issue. And then the last one was just in 2012. And in that report, which I believe is attachment I to the declaration that we filed, the panel praised the thoroughness of EPA's review of kind of the state of the evidence that we have now and the limitations on it, and they recommended some additional studies. And that's the exercise that EPA is involved in now. One of the things it's attempting to do, and one of the reasons it indicated in its most recent letter to petitioners that, you know, we fully intend to finish by the end of February, which is the time that EPA has always intended to finish its human health risk assessment. We're trying to get the raw data from the Columbia authors. And so far, they haven't been willing to provide that data. But it would be critical to have it because, again, we don't know what the doses were. We just had, EPA just has general information from that study. We don't have the study from the individuals. So it may very well show, when you get that data, that when you combine chlorpyrifos with the other organic, organophosphate pesticides that were present, that you may have additive effects that get you to the 10 percent acetylchlorin esterase inhibition, which is what the level at which EPA is regulated on. That study, the Columbia study, I mean, one of the confounding factors here is the levels in the blood were so low that they're not the levels at which chlorinesterase inhibition, that 10 percent chlorinesterase inhibition would occur. And in addition to those studies, there are rodent studies that have occurred. In fact, between 2008, when the first scientific advisory panel met, and 2012, last year when they met for the second time on this issue, there were nine rodent studies that were done looking specifically at neurodevelopmental impacts. And those in vivo studies show that you would not have any neurodevelopmental impacts at levels below those which would cause 10 percent acetylchlorinesterase inhibition. So the science is really confounding. Council? Yes, Your Honor. Counsel, what is quite obvious, and it's been stated as such, is that there is a lack of trust at work here in which the court is being asked to intervene and become a referee about a process that is, as you've just recounted, quite beyond the scope of a three-judge federal appellate panel to make any reasoned judgments about the science, certainly at this stage of the operations. Council has been candid about saying that they filed initially in New York and now here as a way of prodding EPA to move this case along, and they've asserted that EPA has not reacted well until it was faced with the threat of the litigation. I take all of this as heartfelt arguments on both sides, but to cut to the chase as to what this court can or ought to do, do the parties have any way to formulate, given that you've now offered a February 2014 date, any process that doesn't depend on this panel to enforce it? It would say, we can establish some guidelines here, some milestones over the next year to satisfy the petitioners in this case that you've got the message. It would say, is there some process that you all can't work out to move this case along on the time frame that you've now proffered? First off, I guess I would say that I was not involved in the litigation in the Southern District of New York. There was an assistant U.S. attorney involved, and I think there were some understandings that there were quite a bit of discussions there as to resolving the matter. I think it's fair to say that EPA has been overly optimistic at times as to when it could complete this process, but I would also point out that until 2010, EPA didn't even have a framework for involving epidemiological studies into a quantitative risk assessment for conventional pesticide like this. So it's really new ground for EPA, and it's kind of, to me, it's not surprising that it's taking some time to do it, and the first time you do something, it's always a question of how long it's going to take. In terms of whether there's anything we could work out now, there haven't been any discussions with the petitioners since the petition for it at any time, but there's no kind of ongoing process, if you will. We have a mediation unit that you're probably all familiar with. I don't know whether this is appropriate or not, but having served in government myself, it seems to me that this is a kind of a situation where the parties would be best to try to work it out themselves if we, if our mediation unit might be able to help that. I don't have a final position on the merits of this mandamus action. I'm just trying to react to what I see as people of goodwill trying to solve a problem, and why does it have to get up to this level for you all to kind of come to some kind of arrangement where you're all satisfied that you're all some kind of arrangement which would give the petitioners some kind of comfort that you're doing exactly what you say. And if there's something we can do through our mediation unit, that's fine. I realize this involves a lot of policy issues, but that's at least this judge's perspective on how this might be approached. And I've, we've worked with the Ninth Circuit mediators, and I personally have on numerous cases and find them to be excellent. We certainly would not oppose an assessment conference if the mediation office wanted to, wanted to pick it up and see whether that has any, any merit, which is what they typically do. So, what's your response to the notion that we should just retain jurisdiction? Well, I mean, that's, I think that's one of the things we kind of said in our brief that courts have done sometimes, both when they've determined that mandamus isn't quite appropriate and when they've determined that mandamus is appropriate because, I mean, they've recognized that it is a very extreme remedy, particularly in, when an agency's involved. And I guess what I would say is, of course, we want you to deny mandamus relief and dismiss the petition. Right. Just deny the petition. Just deny. But, I mean, if the court were thinking of taking petitioners up on their suggestion that you hold EPA, you know, to this February 14 date, I think the better approach would be to retain jurisdiction and, and see where we are then. See what happens. See where we are then, because, again, one of the things we're trying to do is get this raw data, raw data from the Columbia University authors. If suddenly they finally decide to year, then it might reasonably take a little longer for EPA to deal with it. We just don't know. Why is it that the university is not tendering the data? I have not been involved in those discussions. We presume their concern is that they think they might get criticized or something. I don't know. That's not what EPA has in mind. EPA wants the data to see if it can make some heads or tails out of, you know, what the additive result of, of the organophosphate pesticides that were involved, and can you get the 10% acetylchlorinesterase inhibition from that, and what might be the other impacts of, say, lead and other toxins that were, that were in the cord blood, so. I see that I'm coming up on out of time here. In any event, we've, we've... The red dot means you're... I'm out of time. I'm going the other direction. Okay. In that case, Your Honor, I, I think with the argument to today and our briefs, I will, I will rest. Thank you very much. Thank you very much. The petitioner has some rebuttal time. That was saved. Thank you, Your Honor. Judge Fischer, I too have worked with the Ninth Circuit Mediation Office and would be happy to investigate that as a way to talk about this. I, I think we've always been willing to talk. Our experience when we filed in the Southern District of New York and entered into discussions and stayed our case in order to rely on an EPA commitment of date makes us slightly leery to rely on other commitments that don't have the force of law or a court order behind them. So we are, we, we would approach those talks cautiously, but certainly would want to do that. I don't... The practical problem, at least from my perspective, for us to act in a case of a pesticide is that the harm isn't necessarily a one-way street. That is, if you don't ban a pesticide that should be banned, then people are getting sick or dying or, you know, hurting the people affected by the pesticide. But if you ban a pesticide that shouldn't be banned, then the crop yields are lower and people are going to have starvation or health problems somewhere or another because of less crops. So it's sort of a hard issue for, for a panel to address really. I appreciate that, Your Honor. I think the standards set up at the two statutes we're talking about, we're talking about the Food and Drug Act and we're talking about the Pesticide Act, which is known by the acronym FFRA. Those two standards are to make sure that there is no risk of harm, that there is a certainty of no harm in one statute and no, no risk of harm in the other statute. And that those commands from Congress should mean something in this instance. I don't think EPA is going to answer my petition by just banning crepirefos. I think there will be long and drawn-out discussions about how they would do that and what mitigations measures would happen and the industry would be involved. So I am not concerned that there in an inappropriate spot. There is information in the document Mr. Carson pointed you to that shows that for crops, many crops, there are alternatives which are much less risky and much less harmful. I wanted to say that in the Hausinger Declaration, which EPA submitted, there is interesting information where EPA admits that they think that crepirefos likely played a role in the study. And I would submit that while it is admirable that EPA is trying to get all of the data, at some point in time you need to start making decisions based on the information we have and that the time has gone by for EPA to start taking those measures. Have you tried to get the data from Columbia? No, sir. It shouldn't be the case that petitioners need to file a federal mandamus petition to get EPA to act. And I am afraid unless this Court orders a date certain or continues its jurisdiction that that is the message the agency will hear and that unless we get a schedule from this Court or, again, continuing jurisdiction, that the delay will continue and we will continue to have this harmful toxic nerve poison out there in the environment. Thank you. Thank you, counsel. Thank you, counsel. Thanks for both arguments. Any comments? Case is submitted. So thank you. The case is submitted.
judges: Fisher, Gould, Paez